UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 19-23048-CIV-LENARD/O'SULLIVAN

ELIZABETH KERESE ALVAREZ,[1]

        Movant,

v.

UNITED STATES OF AMERICA,

        Respondent.

_____/

## REPORT AND RECOMMENDATION

THIS MATTER came before the Court on the movant's Motion to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody made pursuant to 28 U.S.C. § 2255. (CIV-DE# 1, 7/22/2019).[2] This matter was referred to the United States Magistrate Judge John J. O'Sullivan by the Honorable Judge Joan A. Lenard for a Report and Recommendation in accordance with 28 U.S.C. § 636(b). (CIV-DE# 3, 7/23/2019). An evidentiary hearing was held on May 27, 2020. (CIV-DE# 25, 5/27/2020). Having carefully considered the Motion to Vacate Sentence (CIV-DE# 1, 7/22/2019), the Answer and Memorandum of Law in Opposition to Motion (CIV-DE# 10, 9/16/2019), the movant's Reply (CIV-DE# 13, 10/07/2019), the movant's Post-Hearing Memorandum of Law (CIV-DE# 27, 6/15/2020), the respondent's Answer and Memorandum of Law (CIV-DE# 28, 6/30/2020), the court file and applicable law, the undersigned respectfully recommends that the movant's Motion to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (CIV-DE# 1, 7/22/2019) be DENIED.

---

[1] The spelling of the movant's name in the style of this action (i.e. "Elizabeth") differs from the correct spelling of her name in the criminal action (i.e. "Elisabet"). See, Trial Transcript (CR-DE# 648, 3/15/217).

[2] Docket entries from the subject civil case will be referenced as CIV-DE#.  Docket entries from the underlying criminal case, *United States v. Elisabet Kerese Alvarez*, Case No. 15-CR-20579-JAL, will be referenced as CR-DE#.

## **PROCEDURAL BACKGROUND**

Elisabet Kerese Alvarez ("Alvarez" or "movant") became the target of a criminal investigation on July 1, 2014, when she went to the office of Odalys Marrero ("Marrero" a/k/a "Tita") and Rolando Mulet ("Mulet") unaware that Homeland Security Investigations ("HSI") agents were executing a search warrant at the office. (CR-DE# 648:75, 3/15/2017). On July 28, 2015, the movant was charged by indictment with conspiracy to commit marriage fraud, in violation of 18 U.S.C. § 371 (Count 1) and marriage fraud, in violation of 8 U.S.C. § 1325(c) (Count 6). (CR-DE# 3, 7/29/2015).  At trial, the movant was represented by counsel of record, David Seltzer, Esq., Menachem Mayberg, Esq., and Martin Hoddenden, Esq.

The movant's criminal jury trial commenced on August 22, 2016. (CR-DE# 646, 3/15/2017).  At the close of the evidence, the movant orally moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Civil Procedure, which the trial Court denied.  (CR-DE# 652:37-56, 57-69, 3/15/2017).  The jury returned a verdict of guilty as charged on August 31, 2016, and the movant timely filed a direct appeal. (CR-DE# 539, 8/31/2016; 624, 12/02/2016). On April 23, 2018, the Court of Appeals for the Eleventh Circuit affirmed the movant's convictions and found that the movant had waived her right to challenge the jury instruction on direct appeal because she invited any potential error by withdrawing her request for the good-faith defense instruction. United States v. Alvarez, 732 F. App'x 729, 735-36 (11th Cir. 2018). On the marriage fraud count, the Eleventh Circuit stated, "[E]ven assuming we required proof that Alvarez knew that her conduct was illegal, the government presented sufficient evidence to sustain the conviction." Id. at 735.

The movant asserts that her trial defense counsel, Menachem Mayberg, Esq., provided ineffective assistance of counsel by waiving the trial Court's offer to give the Eleventh Circuit

pattern good-faith jury instruction. (CIV-DE# 27, 6/15/2020). During the charge conference at the movant's trial, her defense counsel asked that a modified version of the Eleventh Circuit's good-faith jury instruction be used. (CR-DE# 652:92, 3/15/2017). The Court rejected the movant's modified version of the good-faith jury instruction and, instead, gave the movant's counsel the option to use the pattern jury instruction on the good-faith defense. Id. at 99-100. However, the movant's counsel stated that the language in the pattern instruction was "problematic" and declined to have the Court use it. Id. at 99.  The Court explained "for the record that, based upon the initial statement that Osvaldo Lastre Duran ["Duran"] said to Agent Laboy,[3] that they married for sex, that I would have given the special instruction as Special 17 in the pattern in total." Id. at 100. At trial, Duran said that he did not tell the truth when he told Agent Laboy that the marriage was for sex. (CR-DE# 651: 78-79, 3/15/2017).

On July 22, 2019, the movant filed the instant motion seeking habeas relief on the ground of ineffective assistance of counsel. (CIV-DE# 1, 7/22/2019). At the evidentiary hearing held before the undersigned on May 27, 2020, the movant's former trial defense counsel, Menachem Mayberg, Esq.,[4] was the only witness who testified. (CIV-DE# 25, 5/27/2020). Mr. Mayberg testified that he could not recall the basis or justification for his belief that the pattern good faith defense jury instruction that he did not request at trial was "problematic." (CIV-DE# 28:14, 6/30/2020).

At the conclusion of the evidentiary hearing, the undersigned ordered the parties to file supplemental briefs.  On June 15, 2020, the movant filed the Movant's Post-Hearing Memorandum of Law in Support of Motion to Vacate Conviction pursuant to 28 U.S.C. § 2255.  (CIV-DE# 27,

---

[3] Agent Mildred Laboy ("Agent Laboy") is a special agent with Homeland Security Investigations ("HSI").
[4] The movant's former criminal trial defense counsel was the only witness who testified at the May 27, 2020 evidentiary hearing.  See Exhibit and Witness List (DE# 24, 5/26/2020).

6/15/20).  On June 30, 2020, the government filed the Government's Answer and Memorandum in Opposition to the Movant's Motion to Vacate Sentence under 28 U.S.C. § 2255.  (CIV-DE# 28, 6/30/20).  The movant's Motion to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody made pursuant to 28 U.S.C. § 2255. (CIV-DE# 1, 7/22/2019) is ripe for disposition.

## FACTUAL BACKGROUND

The movant is a Venezuelan citizen who entered the United States on a B-2 visitor visa, later applied for a student visa, and was at all times legally present in the United States. (CR-DE# 648:75, 649: 86; 652:19, 28, 3/15/2017). The movant did not testify at trial.

### I.     Special Agent Mildred Laboy's Trial Testimony

Special Agent Mildred Laboy ("Agent Laboy"), a Homeland Security Investigations ("HSI") agent testified at the trial and provided the following information. On July 1, 2014, Agent Laboy and other agents of HSI executed a search warrant on Tita's Tramite & Travel and searched the premises to gather evidence regarding allegations of marriage fraud by the business. (CR-DE# 648:73, 3/15/2017).  While HSI was conducting its search at Tita's Tramite & Travel, the movant walked into the business and was sitting in the lobby.  Id. at 75.  Agent Laboy sat next to the movant and asked the movant why she was there.  Id.  Agent Laboy explained that they were in the middle of a search warrant that was related to allegations of the business arranging fraudulent marriages.  Id.

Agent Laboy testified that the movant told Agent Laboy that she met Marrero and Mulet at a barbecue at a friend's house, that the movant spoke to Marrero and Mulet about her immigration situation, and that Marrero and Mulet told the movant that they help people fix their immigration status and gave the movant their business card to make an appointment. (CR-DE# 648:76, 3/15/2017). Agent Laboy testified that the movant told Agent Laboy that she retained

Marrero and Mulet's services to find a Cuban national with whom she could enter a marriage, which Marrero and Mulet told the movant was the only way they could help her. Id. Agent Laboy testified that Manuel Andres Gomez ("Gomez")[5] and his attorney told Agent Laboy that Marrero and Mulet operated a business called Tita's Tramite & Travel, which maintained an office on a busy street in Miami and arranged fraudulent marriages so their clients could obtain lawful permanent residency. Id. at 21, 62-64. The movant told Agent Laboy that she paid Marrero and Mulet $6,000 cash to start the process. Id. at 76-77.  Agent Laboy testified that at another time the movant said she only paid $2,500 cash. (CR-DE# 649:99, 3/15/2017).  Agent Laboy testified that the movant told her that Marrero and Mulet advised the movant that they would charge her $5,000 to complete the immigration paperwork for her. (CR-DE# 648:76, 3/15/2017) (The movant told Agent Laboy that "the total amount would have been a little bit over $10,000, about $11,000, for all of that."); (CR-DE# 649: 99, 3/15/2017).

Agent Laboy testified that the movant said she married Duran, a Cuban national, on April 11, 2014, with Mulet officiating over the ceremony and notarizing the documentation at Tita's Tramite and Travel. (CR-DE# 648: 19, 3/15/2017). A couple of days after she married Duran, the movant traveled back to Venezuela because of work and to see her sick grandmother. (CR-DE# 648:78, 3/15/2017).  Agent Laboy testified that the movant left the United States shortly after her marriage to Duran on April 11, 2014 and returned on June 29, 2014. (CR-DE# 649:101, 3/15/2017).  The marriage license was filed with the Bureau of Marriages, the Clerk of the Courts on April 14, 2014. Id.  at 18-20; Government Ex. 10.

Agent Laboy testified that on July 1, 2014, the movant told her that she was at Tita's Tramite & Travel to take chocolate to Marrero because the movant travelled to Venezuela after

---

[5] Gomez is a former disgruntled client of Marrero and Mulet who testified at trial.

Marrero and Rolando had notarized the marriage license. (CR-DE# 648: 75-76, 3/15/2017). The movant also told Agent Laboy that she was there to tell Marrero that she wanted to file for divorce. (CR-DE# 649: 57, 3/15/2017). When asked by Agent Laboy, the movant provided Duran's name but denied that she had his address or telephone number. (CR-DE# 648:77, 3/15/2017). Agent Laboy did not testify that the movant gave any indication that the movant believed she had done anything illegal. Id. at 75-78. Agent Laboy's July 1, 2014 interview of the movant was not recorded as that is not HSI's policy and procedure. (CR-DE# 649:60-62, 3/15/2017).

Agent Laboy testified about the statements the movant made during a second interview that Agent Laboy conducted on July 2, 2014 in the Doral office of HSI. (CR-DE# 648:79, 3/15/2017). While going over the movant's prior statements, Agent Laboy testified that she observed the movant becoming agitated, aggressive, denying her July 1, 2014 statements and accusing Agent Laboy of making up the movant's prior statements. Id. at 79-80. The movant repeatedly stated that she met Duran at a shopping center, they had great sex, fell in love and got married. Id. at 80-81. During the July 2, 2014 interview, Agent Laboy advised the movant that the movant may answer her cell phone that repeatedly rang during the interview. Id. at 81. The movant did not answer her cell phone but allowed Agent Laboy to see the movant's cell phone. Id. Agent Laboy noticed on the screen of the cell phone that the caller was Duran and that the call log between the movant and Duran began on July 1, 2014. Id.

Agent Laboy testified that the movant, Duran and other individuals were arrested on August 19, 2015. (CR-DE# 648: 107, 3/15/2017). Agent Laboy testified that she read the movant her *Miranda* rights. Id. at 107-108. The movant waived her *Miranda* rights and spoke to Agent Laboy. Id. Agent Laboy provided the following testimony regarding the movant's post-

*Mirandized* statement.  Agent Laboy testified that in her *Mirandized* post-arrest statement, the movant told Agent Laboy that she had retained Marrero and Mulet to help her with her immigration status. Id. at 108.  The movant told Agent Laboy that she married Duran to obtain her legal permanent resident card. Id.  Agent Laboy testified that after their first meeting on July 1, 2014, the movant told Agent Laboy that Duran called the movant, they met up and came up with their story about how they met, had great sex, and were married. Id. at 111. Agent Laboy testified that the movant said that the movant and Duran came up with the story because they were afraid of getting in trouble. Id. The movant told Agent Laboy that on a different occasion the movant and Duran took naked photos of themselves at a motel to show them to Agent Laboy or other officials. Id.  Agent Laboy testified that the movant told her that the movant and Duran took the pictures because they were desperate to be able to prove that their marriage was real, so they came up with the story of sex and met up at a motel and took pictures of themselves simulating that they were having sex. (CR-DE# 649:79-80, 96-97, 3/15/2017).  Agent Laboy testified that the movant told her that the movant never lived with Duran, never had a romantic relationship with Duran, never had sex with Duran, and that the thought of having sex with Duran was gross due to Duran's physical appearance.  Id. at 100.

At trial, the Court admitted Government Exhibits 18A through G, which were some of the documents, pertaining to the movant, that were found on top of Mulet's desk during HSI's execution of the search warrant on Tita's Tramite & Travel on July 1, 2014.  Id. at 92-93. Government Exhibits 18A through G include: a color copy of the movant's Venezuelan passport (Ex. 18-B), Duran's Immigration Form G-325 (Ex. 18-C), a color copy of Duran's Florida driver's license (Ex. 18-D), Duran's Cuban birth certificate (Ex. 18-E), a color copy of Duran's

green card (Ex. 18-F), and a color copy of Duran's Cuban passport (Ex. 18-G). Id. at 92-93, 97, 99, 103.

## II.     Osvaldo Lastre Duran's Trial Testimony

At trial, Duran, a Cuban national, testified that before the marriage, the movant and Duran discussed with Marrero that the purpose of the marriage was to obtain lawful permanent residency for the movant and that Duran would be paid $5,000.  (CR-DE# 648: 106, 109; 649: 106, 109, 3/15/2017).  Duran testified that Marrero told the movant and Duran to take pictures together with different clothes at a Cuban restaurant, La Carreta, at Ermita de la Caridad, a church, and a Venezuelan place named El Arepazo, after marrying to appear as if they were in a romantic relationship, as these photos would possibly be included in the movant's application for adjustment of immigration status. Id. at 110-11.  Additionally, Marrero explained that, on a later date, she would provide Duran and the movant a written document of questions to help them prepare for a marriage interview conducted by the United States Immigration and Citizenship Services.  (CR-DE# 649:112, 3/15/2017). Duran testified that he did not know his conduct was illegal.  (CR-DE# 651:73, 3/15/2017). Duran testified that the movant did not express any concerns or worries about getting married.  Id. at 105.  Duran testified that he married the movant for the sole purpose of helping her obtain an immigration benefit and evade immigration laws. Id. at 107. Duran testified that they took pictures "to show that [they] were having sex. But we did not have any sex. We did not have any intimate relationship. It was just to make believe that we did."  (CR-DE# 650:21, 3/15/2017). Duran admitted at trial that he deceived the movant and did not disclose having a common-law wife and children until after they were married.  (CR-DE# 651:15-16, 3/15/2017).

Duran testified that within a couple of days of marriage, the movant told Duran that she had to travel to Venezuela for work and to see her sick grandmother.  (CR-DE# 650:8-10,

3/15/2017). Duran drove the movant to the airport and told her that he thought her travel to Venezuela shortly after their marriage would not look good at an immigration interview. <u>Id</u>. at 8. Duran testified that the movant told Duran that her grandmother's illness is an emergency and that she would remain in contact with him while she was gone. <u>Id</u>. 8-9. The movant remained in Venezuela for more than two months thereafter. (CR-DE# 650:11, 3/15/2017). Duran testified that he did not communicate via emails, texts, mailings, FaceTime, WhatsApp, or Skype connections with the movant while she was in Venezuela. (CR-DE# 651:40-44, 3/15/2017). Duran testified that the movant did not send him anything to indicate they were in a relationship while she was in Venezuela. <u>Id</u>. at 44.

Duran testified that the movant called him on July 1, 2014 after she met with Agent Laboy and told him that she wanted to speak with him because she was questioned by the police. (CR-DE# 650:13, 14-15; 651: 44, 3/15/2017). Duran testified that the movant and Duran met that day and the movant told him that she told the police about their false marriage. (CR-DE# 650:15-16, 3/15/2017). Duran testified that in response he asked the movant, "How are you going to tell the truth to the police? You know that if you say that, we're already in jail." <u>Id</u>. at 16. Duran testified that the movant advised him that she had an appointment the next day at the police office and invited Duran to go with her, but he refused. <u>Id</u>. at 16-17. Duran testified that they had agreed to say that they met at a mall, their marriage was real, because of love, and she needed to travel to Venezuela to see her sick grandmother. <u>Id</u>. at 17.

Duran testified that after the July 2, 2014 interview with Agent Laboy, the movant met with Duran and told him that she denied what she told Agent Laboy on July 1, 2014 because she felt nervous, pressured and coerced, but that the marriage was for real and they married for love. <u>Id</u>. at 19. Duran testified that the marriage was not real and was not based on love. <u>Id</u>. Duran

testified that the couple decided to go to a motel and take nude photos to look like they were having sex, but they did not have sex and did not have an intimate relationship. Id. 20-22. Duran testified that the movant and he decided that they were going to convince whoever they needed to that the marriage was for real and that it was based on love. Id. at 19-20. Duran commenced divorce proceedings on July 29, 2014 and was divorced from the movant in December 2014. Id. at 25-26; Government Ex. 19.

Duran testified that he spoke with Agent Laboy two or three times before he was arrested. (CR-DE# 650:27-28, 3/15/2017). Duran testified that he had relationship problems with his long-time partner and the mother of his children. (CR-DE# 650:29-30). Duran testified that he told Agent Laboy that he married the movant for sex. Id. at 30. Duran testified that he married the movant for money, not love, to help the movant obtain her legal status in the United States and for Duran to receive money. Id.

Duran testified that on August 19, 2015, the movant and Duran were arrested separately but placed in the backseat of a police car together. (CR-DE# 650:34-35). Duran testified that he thought he and the movant were placed inside the police car in order to record their conversation or videotape them. Id. at 35. Their conversation was recorded. Id. at 36, 39, 43; Transcript of the recording (Government Ex. 4); CD of the recording (Government Ex. 8). Duran testified that while they were in the police car together, the movant kept telling Duran to tell the truth and that it was in his best interest to tell the truth. Id. at 35-36, 47-50. Duran testified that he thought their conversation was being recorded and that the movant was trying to incriminate him. Id. at 48. While Duran and the movant were in the backseat of the police car, Duran testified that he stated, "We got married because we liked each other and to have – have sex." Id. at 49. At trial, Duran

testified that he understood he was doing something wrong but did not think it was a crime at the time he married the movant to help her evade immigration laws.  Id. at 51.

The government did not produce any initialed notes of a confession by the movant, any photographs taken by or of the movant, or any records indicating that the movant made any calls to the government's witnesses. (CR-DE# 653:58-59, 95-97, 100-104, 3/15/2017).

### III.   Manuel Andres Gomez's Trial Testimony

At trial, Manuel Andres Gomez, a government witness who was a disgruntled former client of Tita's Tramite & Travel, testified about his dealings with Marrero and Mulet in 2012 to resolve his immigration status issues by marrying to obtain a green card.  (CR-DE# 647:53-78). Gomez testified that Marrero required cash payments to pay for a Cuban national bride, that Mulet married the couple in their office the same day as they obtained the marriage license, that Marrero advised them to take photographs to document their relationship and suggested that they go to Ermita de la Caridad, and provided the couple with sample immigrations questions. Id. Gomez never met the movant and had no knowledge of her interactions with Marrero, Mulan or Duran. (CR-DE# 647:83; CR-DE# 648: 6, 20-21).

### LEGAL ANALYSIS

### I.   Ineffective Assistance of Counsel

The Eleventh Circuit applies the two-prong test set forth in Strickland v. Washington, 466 U.S. 668, 687-88 (1984), to analyze an ineffective assistance of counsel claim. Strickland requires the defendant to prove that: (1) counsel's representation of the movant fell below an objective standard of reasonableness; and (2) the deficient performance prejudiced the defense. Gordon v. Unites States, 518 F.3d 1291, 1297 (11th Cir. 2008) (citing Strickland, id.); Diaz v. United States, 930 F.2d 832, 834 (11th Cir. 1991).  The movant bears the burden of proof and must prove both

prongs to prevail on an ineffective assistance of counsel claim.  Johnson v. Alabama, 256 F.3d 1156, 1176 (11th Cir. 2001).  "The *Strickland* test is not easily met; as we have said, 'the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between.'"  Id. (quoting Waters v. Thomas, 46 F.3d 1506, 1511 (11th Cir. 1995) (en banc) (quoting Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994) and affirming denial of Waters' habeas petition).  The Supreme Court explained:

> there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.  In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.

Strickland, 466 U.S. at 697; Waters, 46 F.3d at 1510 ("adopt[ing] the holding that [habeas] relief was properly denied as to the guilt stage ineffective assistance of counsel claims because Waters failed to establish the prejudice component, but we do not reach the question of whether those claims otherwise would have had merit").

"Judicial scrutiny of counsel's performance must be highly deferential." Strickland, 466 U.S. at 689. "Trial counsel's representation is judged by a standard of 'reasonableness under prevailing professional norms,' and there is a 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.'" Rosin v. United States, 786 F.3d 873, 877 (11th Cir. 2015) (quoting Strickland, 466 U.S. at 688-89). The reasonableness of counsel's conduct must be evaluated from counsel's perspective at the time. Strickland, 466 U.S. at 689. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Id. at 690.  While the Eleventh Circuit provides a pattern jury instruction on the good-faith defense, it is only proper for the Court to give that instruction if

the record contains some evidence in support of that defense.  See United States v. Williams, 728 F.2d 1402, 1404 (11th Cir. 1984).

Regarding the second prong, prejudice is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. Overwhelming evidence of guilt is one factor that may be used to find that an error was harmless. United States v. Guzman, 167 F.3d 1350, 1353 (11th Cir. 1999); see McKenzie v. Secretary, Florida Dep't. of Corrections, 507 Fed. App'x 907, 909 (11th Cir. 2013) (finding no prejudice from failure to object to inadmissible hearsay where evidence of guilt was overwhelming); see also, Waters, 46 F.3d at 1510 (holding that "Waters' guilt stage ineffective assistance of counsel claims due to be denied because the evidence of guilt was so overwhelming that Waters cannot show prejudice from any of the claimed shortcomings of his counsel at the guilt stage"). Additionally, failure to raise a meritless issue cannot form the basis of a successful ineffective assistance of counsel claim. See Brownlee v. Haley, 306 F.3d 1043, 1066 (11th Cir. 2002) (counsel was not ineffective for failing to raise issues clearly lacking in merit); Chandler v. Moore, 240 F.3d 907, 917-18 (11th Cir. 2001) (rejecting argument for ineffective assistance of counsel where counsel failed to raise a non-meritorious issue).

## II.    Marriage Fraud

"Federal law prohibits '[a]ny individual … [from] knowingly enter[ing] into a marriage for the purpose of evading any provision of the immigration laws.'" United States v. Alvarez, 732 F. App'x 729, 735 (11th Cir. 2018) (citing 8 U.S.C. § 1235(c)).  To prove marriage fraud under 8 U.S.C. § 1235(c), "the government must show that (1) the defendant knowingly entered into a marriage (2) for the purpose of evading any provision of the immigration laws." United States v. Rojas, 718 F.3d 1317, 1320 (11th Cir. 2013). In the movant's direct appeal, the Eleventh Circuit

acknowledged that "some circuits have required that the government also prove the defendant knew that her conduct was illegal when she entered the marriage," but determined that the Eleventh Circuit "has not determined whether such a showing is necessary." Alvarez, 732 F. App'x at 735 (citing Rojas, 718 F.3d at 1320 n.2) (explaining that it was unnecessary for the Eleventh Circuit to answer the question because it did not affect the Eleventh Circuit's statute of limitations analysis of when the crime of marriage fraud was completed); see Tsoy v. United States, 781 Fed. App'x 909, 912 (11th Cir. 2019) (rejecting the defendant's argument that he did not "trick" or "defraud" the government because he "never finished the green card application" and "never actually received a green card" after his marriage").   Relying on Rojas, in Tsoy, the Eleventh Circuit explained:

> [F]raudulently *obtaining* a green card is not an element of marriage fraud, which criminalizes merely *entering into a marriage* for the *purpose* of evading immigration laws. Marriage fraud is not a "continuing offense," and if Tsoy "entered into a marriage with the purpose of evading the immigration laws" on July 6, 2015, "he completed the crime of marriage fraud on that date."

Tsoy, 781 Fed. App'x at 912 (quoting Rojas, 718 F.3d at 1320).

In the movant's direct appeal, the Eleventh Circuit determined that "[t]he district court did not err in denying Alvarez's motion for a judgment of acquittal because the government presented sufficient evidence to prove both charges beyond a reasonable doubt." Alvarez, 732 F. App'x at 735.   In Alvarez, the Eleventh Circuit explained that "[a]s to marriage fraud, *even assuming we required proof that Alvarez knew that her conduct was illegal*, the government presented sufficient evidence to sustain the conviction."   Id. (emphasis added) (citing Rojas, 718 F.3d at 1320 n.2). The Eleventh Circuit explained:

> The government presented evidence that Alvarez married Duran, a Cuban citizen, and, prior to their marriage, they discussed that the purpose of the marriage was to obtain legal status for Alvarez to remain permanently in the United States.   The government also presented evidence that Alvarez and Duran did not plan to have a life together as a married

couple.  Prior to their marriage, Alvarez and Duran discussed that they would need to take pictures and practice questions to make their marriage look real during the immigration interview, indicating that Alvarez knowingly entered the marriage in order to evade U.S. immigration laws.  Notably, if Alvarez believed that marrying Duran just to obtain lawful permanent resident status was in accordance with U.S. immigration law, she would have had no reason to take fake pictures and other steps to convince immigration authorities that their marriage was real.

Alvarez, 732 F. App'x at 735.

## III.  <u>Conspiracy to Commit Marriage Fraud</u>

"Federal law prohibits conspiring to commit an offense against the United States or to defraud the United States."  <u>Alvarez</u>, 732 F. App'x at 735 (citing 18 U.S.C. § 371).  "To prove conspiracy under [Section] 371, the government must establish: '(1) an agreement by two or more individuals to commit an offense against or defraud the United States; (2) knowing and voluntary participation; and (3) an overt act by a conspirator.'"  <u>Id</u>. (quoting <u>United States v. Gonzalez</u>, 834 F.3d 1206, 1219 (11th Cir. 2016).

In her direct appeal in <u>Alvarez</u>, the Eleventh Circuit held that the government provided sufficient evidence to prove conspiracy to commit marriage fraud.  <u>Id</u>.  The Eleventh Circuit explained that evidence at trial proved that:

> in addition to Alvarez and Duran agreeing to marry as part of the scheme, at least two other people agreed to be involved, and Alvarez's marriage was part of a larger marriage fraud conspiracy including at least two other people. Alvarez had paid Marrero and Mulet to find her a Cuban husband. Mulet had married Alvarez and Duran, and Marrero instructed them on how to make their marriage look real. Furthermore, Manuel Gomez testified regarding his fraudulent marriage to a Cuban woman that he had entered into under Marrero and Mulet's direction in order to resolve his immigration issues.
> Second, … the government presented sufficient evidence that Alvarez was a knowing and voluntary participant in the fraudulent marriage, which was part of the conspiracy. Third, the government presented evidence that an overt act was committed in furtherance of the scheme because Alvarez went through a staged marriage ceremony on April 11, 2014. Accordingly, the evidence was sufficient for a reasonable factfinder to find Alvarez guilty beyond a reasonable doubt as to both offenses.

<u>Id</u>. (citing <u>United States v. Seher</u>, 562 F.3d 1344, 1364 (11th Cir. 2009)).

IV.     **Habeas Relief Is Not Warranted**.

The movant seeks habeas relief on the ground that her defense counsel provided ineffective assistance of counsel because her defense counsel failed to request the Eleventh Circuit's pattern good-faith jury instruction after the Court denied her defense counsel's request to provide a modified version of the pattern good-faith jury instruction. Motion at 5 (CIV-DE# 1, 7/22/19). The movant argues that because the pattern good-faith instruction was not given and no other mens rea instruction was given, the movant's counsel provided ineffective assistance of counsel because he could not argue her good faith defense to the jury. Id.

In her direct appeal, the Eleventh Circuit held that "Alvarez is precluded from raising this argument because she invited any error in the district court's decision to not instruct the jury regarding her good-faith defense." Alvarez, 732 Fed. App'x at 736.  In her post-evidentiary hearing memorandum, the movant contends that the government's "'strategy' justification for waiving the defendant's right to have the good faith theory of defense instruction submitted to the jury—failed at the evidentiary hearing given the candid testimony of defense counsel on direct and cross-examination and further examination by the Court." Movant's Post-Hearing Memorandum at 1-2 (CIV-DE# 27, 6/15/20).  The movant argues that "the government's evidence that the movant knew, at the time of the offenses, that her conduct was *illegal*, was weak and subject to varying interpretations."  Id. at 13. The movant contends that the good faith jury instruction should have been given in this case because the movant did not undertake steps to use the marriage for an improper purpose regarding her immigration status.  Id. The movant "did not follow through with payments needed to effectuate the use of the marriage for an improper purpose, there was no

attempt to verify or document the marriage to enable such use." <u>Id</u>. The movant argues that "at nearly the earliest opportunity [she] abandoned and terminated the marriage." <u>Id</u>. The movant argues further that "Duran's testimony lends support to the good faith theory that getting married and doing nothing to use it illegally supports a defense of good faith lack of intention to violate the law." <u>Id</u>. at 13.  The movant contends that the facts created reasonable doubt as to whether the movant knew when she married Duran that her conduct was illegal. <u>Id</u>. at 14.

The movant argues that the government's eleventh-hour "harmless error" argument is unwarranted in this case because: (1) the government's failure to claim harmless error is inconsistent with the Eleventh Circuit's failure to make a finding of either harmless error or overwhelming evidence of guilt on the movant's direct appeal; (2) the testimony of Duran and Agent Laboy supported a good faith argument in many ways; and (3) the movant "never even took the first step of filling out a form to use the marriage for immigration benefits, much less submitting or swearing to such a form." Movant's Post-Hearing Memorandum at 3 (CIV-DE# 27, 6/15/20). The movant contends that "unlike every other reported case—there was no objective immigration fraud attempt to mark [the movant's] intent as criminal, much less to meet the heightened level of criminal intent required for a conviction of a marriage crime."  <u>Id</u>.

The government argues that "there is no evidence that counsel's representation fell below an objective standard of reasonableness or that the [m]ovant was prejudiced in any way because there is no evidence that the [m]ovant acted in good-faith such that it would have been appropriate to so instruct the jury." Answer at 1 (CIV-DE# 10, 9/16/19).  Additionally, the government argues that movant's counsel did not provide ineffective assistance of counsel because any assertion of possible good faith on the movant's part was meritless because there was no evidence indicating that the movant had an honestly formed belief that she was marrying her spouse for a legitimate

purpose. Id. at 8.  The government maintains that there is no record evidence to show that the movant and Duran desired or attempted to create a legitimate marital relationship.  Id.  The government argues further that even if this Court finds that the movant's counsel's representation fell below an objective standard of reasonableness, the Court should deny habeas relief on the ground that the evidence of the movant's criminal knowledge and intent was so substantial that any prejudice was insufficient to warrant habeas relief.  Post-evidentiary Hearing Answer (DE# 28, 6/30/20). The undersigned agrees and recommends that this Court deny habeas relief.

**A.**  **The Movant Has Failed to Satisfy the Prejudice Prong of *Strickland***

To prove prejudice, the burden is on the movant to show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In affirming this Court's denial of the movant's motion for judgment of acquittal on direct appeal, the Eleventh Circuit held there was sufficient evidence to uphold the movant's conspiracy to commit marriage fraud and marriage fraud convictions.  United States v. Alvarez, 732 Fed. App'x 729, 734 (11th Cir. 2018).  The Eleventh Circuit did not address the merits of the movant's argument that this Court abused its discretion by refusing to give the movant's requested modified good faith jury instruction because the Eleventh Circuit found that the movant invited the error.  Id. at 736. The movant did not request the pattern good faith jury instruction, which this Court indicated it would give based on the testimony that Duran entered the marriage for sex.  After the district court gave the jury instructions, the movant did not raise any objections. Id.

The crime of marriage fraud is complete when the marriage occurs. It is not a continuing crime as the movant suggests when she argues that she did not commence any change to her immigration status.  See United States v. Rojas, 718 F.3d 1317, 1320 (11th Cir. 2013). In Rojas,

the Eleventh Circuit reversed the denial of Rojas' motion to dismiss his marriage fraud indictment because the marriage fraud crime was complete on the date of Rojas' marriage and was time-barred.  Id. at 1318.  The Eleventh Circuit held that marriage fraud is not a continuing offense.  Id. at 1320.  "[A]t the time Rojas entered into the marriage, [he] did so for the purpose of violating the immigration laws—namely, using the marriage to adjust Marino's immigration status."  Id. The Eleventh Circuit explained that "[t]he plain language of the marriage fraud statute … cannot plausibly be read to require that a defendant take the additional step of filing for immigration benefits in order for the crime to be complete."  Id., id. n.2 (declining to address the question of "whether the government must also prove an additional element, required by some circuits, that the defendant entered the marriage with knowledge that the conduct was unlawful") (citing United States v. Chowdhurry, 169 F.3d 402, 407 (6th Cir. 1999)).  In Rojas, the Eleventh Circuit explained that "[f]iling for immigration benefits may serve as circumstantial evidence of the defendant's unlawful purpose" and may lead to other criminal charges, but marriage fraud is complete when the marriage occurred.  Id.

In the present case, Agent Laboy testified that the movant told Agent Laboy that the movant paid a sum of cash (either $6,000 or $2,500) to Tita's Tramite & Travel to marry Duran, a Cuban national.  The movant and Duran obtained a marriage license, were married on April 11, 2014, and provided the marriage license to the Clerk of Courts, Marriage Bureau. In her first interview with Agent Laboy, the movant admitted her plan to marry Duran to obtain immigration benefits.  After that initial July 1, 2014 interview, the movant called Duran, met with him and decided to make up their story that they met at a shopping mall and married for sex.  At her July 2, 2014 interview with Agent Laboy, the movant denied what she told Agent Laboy on the previous day and told Agent Laboy that she met Duran at a shopping mall and married him for sex.  After

the movant's meeting with Agent Laboy on July 2, 2014, the movant and Duran checked into a motel and took nude photographs to provide proof of their relationship.

At trial, the evidence in the record included inconsistent statements made by the movant and Duran. On at least one occasion, each of them said they married for sex. On separate occasions both denied ever having sex with each other and the movant told Agent Laboy that the idea of sex with Duran was gross. On another occasion, each of them said they married for the movant to receive an immigration status benefit. Duran testified that Marrero, the movant and he discussed that the purpose of the marriage was to obtain lawful permanent residency for the movant and that Duran would be paid $5,000. Duran testified that Marrero suggested that they take photographs in different locations.  The fact that the movant and Duran divorced within the same year does not alter the reason the movant and Duran agreed to marry in the first place.

There is no evidence of the movant engaging Tita's Tramite & Travel for legitimate match-making services.  The movant was never in a romantic relationship with Duran and never intended to live with him.  Documents seized during the execution of the search warrant included documents that would be necessary for the movant to seek a change to her immigration status.

The trial evidence of the movant's decision to enter the marriage for the purpose of evading any provision of the immigration laws is overwhelming.  Although the movant and Duran provided inconsistent statements, the record shows that the movant had no plans to create a permanent life with Duran as a married couple and that the couple did not have a romantic relationship.  Their attempt to cover up their fraudulent marriage after the fact by creating the shopping mall story and taking nude photographs in a motel supports the movant's marriage fraud conviction as well as the conspiracy to commit marriage fraud conviction. See Alvarez, 732 Fed. App'x at 735 (describing the facts that support both convictions).  In Alvarez, the Eleventh Circuit noted that "if Alvarez

believed that marrying just to obtain lawful permanent resident status was in accordance with U.S. immigration law, she would have had no reason to take fake pictures and other steps to convince immigration authorities that their marriage was real."  Id.

The trial Court was willing to provide the Eleventh Circuit pattern good faith jury instruction based on the disputed evidence that the couple married for sex.  While the Eleventh Circuit provides a pattern jury instruction on the good-faith defense, it is only proper for the Court to give that instruction if the record contains some evidence in support of that defense.  See United States v. Williams, 728 F.2d 1402, 1404 (11th Cir. 1984).  Even if, without deciding whether, trial counsel's failure to request the pattern good faith jury instruction constituted ineffective assistance of counsel, the movant has failed to show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

The undersigned finds that there is overwhelming evidence to support the movant's convictions.  The marriage fraud crime was complete when the movant married Duran for the purpose of gaining an immigration benefit.  The jury considered all of the evidence, including the disputed inconsistent statements made by the movant and Duran that they married for sex and their statements that they did not have sex. The movant told Agent Laboy that the idea of sex with Duran was gross. Although the movant never filed an application to change her immigration status, the movant's file found on Mulet's desk during the execution of the search warrant on Tita's Tramite & Travel included documents that would be needed to change her immigration status.  The overwhelming evidence supports the movant's convictions for marriage fraud and conspiracy to commit marriage fraud.  The plaintiff has failed to show that even if the trial Court gave the pattern good faith jury instruction that there is a reasonable probability that the outcome would have been

different. Because the movant has not satisfied the prejudice prong of <u>Strickland</u>, this Court need not consider the performance prong, and should deny the movant's habeas relief.

## **RECOMMENDATION**

Based on the foregoing, the undersigned respectfully **RECOMMENDS** that the movant's Motion to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody made pursuant to 28 U.S.C. § 2255. (CIV-DE# 1, 7/22/2019) be DENIED.

The parties will have fourteen (14) days from the date of receipt of this Report and Recommendation within which to serve and file written objections, if any, with the Honorable Joan A. Lenard, United States District Court Judge. Failure to file objections timely shall bar the parties from a de novo determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in the Report except upon grounds of plain error if necessary in the interest of justice. See 28 U.S.C § 636(b)(1); <u>Thomas v. Arn</u>, 474 U.S. 140, 149 (1985); <u>Henley v. Johnson</u>, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

RESPECTFULLY SUBMITTED at Miami, Florida this <u>19</u>th day of August, 2020.

JOHN J. O'SULLIVAN
CHIEF UNITED STATES MAGISTRATE JUDGE