## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-23048-CIV-LENARD/O'SULLIVAN
(Criminal Case No. 15-20579-Cr-Lenard)

**ELISABET KERESE ALVAREZ,**

Movant,

**v.**

**UNITED STATES OF AMERICA,**

Respondent.

_____/

## ORDER ADOPTING REPORT AND RECOMMENDATION (D.E. 29), DENYING MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE (D.E. 1), DENYING CERTIFICATE OF APPEALABILITY, AND CLOSING CASE

**THIS CAUSE** is before the Court on the Report and Recommendation of Magistrate Judge John J. O'Sullivan issued August 19, 2020. ("Report," D.E. 29.)[1] Movant Elisabet Alvarez filed Objections on September 2, 2020, ("Objections," D.E. 30), to which the Government filed a Response on September 25, 2020, ("Response," D.E. 32). Upon review of the Report, Objections, Response, and the record, the Court finds as follows.

## I.    Background

On July 28, 2015, a Grand Jury sitting in the Southern District of Florida returned an Indictment charging Movant with conspiracy to commit marriage fraud in violation of

---

[1]    The Court will cite docket entries in this civil case as "(D.E. [#])," and will cite docket entries in the underlying criminal case as "(Cr-D.E. [#])."

18 U.S.C. § 371 (Count 1), and marriage fraud in violation of 8 U.S.C. § 1325(c) (Count 6). (Cr-D.E. 1.)  Trial commenced August 22, 2016. (Cr-D.E. 517.)  Because Movant does not object to Judge O'Sullivan's recitation of the relevant evidence adduced at trial, the Court reproduces it here for consistency:

> The movant is a Venezuelan citizen who entered the United States on a B-2 visitor visa, later applied for a student visa, and was at all times legally present in the United States. (CR-DE# 648:75, 649: 86; 652:19, 28, 3/15/2017).  The movant did not testify at trial.

## I.    Special Agent Mildred Laboy's Trial Testimony

> Special Agent Mildred Laboy ("Agent Laboy"), a Homeland Security Investigations ("HSI") agent testified at the trial and provided the following information. On July 1, 2014, Agent Laboy and other agents of HSI executed a search warrant on Tita's Tramite & Travel and searched the premises to gather evidence regarding allegations of marriage fraud by the business. (CR-DE# 648:73, 3/15/2017).  While HSI was conducting its search at Tita's Tramite & Travel, the movant walked into the business and was sitting in the lobby. Id. at 75.  Agent Laboy sat next to the movant and asked the movant why she was there. Id.  Agent Laboy explained that they were in the middle of a search warrant that was related to allegations of the business arranging fraudulent marriages. Id.

> Agent Laboy testified that the movant told Agent Laboy that she met [Co-Defendants Odalys "Tita"] Marrero and [Rolando] Mulet at a barbecue at a friend's house, that the movant spoke to Marrero and Mulet about her immigration situation, and that Marrero and Mulet told the movant that they help people fix their immigration status and gave the movant their business card to make an appointment. (CR-DE# 648:76, 3/15/2017).  Agent Laboy testified that the movant told Agent Laboy that she retained Marrero and Mulet's services to find a Cuban national with whom she could enter a marriage, which Marrero and Mulet told the movant was the only way they could help her. Id.  Agent Laboy testified that Manuel Andres Gomez ("Gomez")[2] and his attorney told Agent Laboy that Marrero and Mulet operated a business called Tita's Tramite & Travel, which maintained an office on a busy street in Miami and arranged fraudulent marriages so their clients could obtain lawful permanent residency. Id. at 21, 62-64.  The

---

[2]    Gomez is a former disgruntled client of Marrero and Mulet who testified at trial.

movant told Agent Laboy that she paid Marrero and Mulet $6,000 cash to start the process. Id. at 76-77. Agent Laboy testified that at another time the movant said she only paid $2,500 cash. (CR-DE# 649:99, 3/15/2017). Agent Laboy testified that the movant told her that Marrero and Mulet advised the movant that they would charge her $5,000 to complete the immigration paperwork for her. (CR-DE# 648:76, 3/15/2017) (The movant told Agent Laboy that "the total amount would have been a little bit over $10,000, about $11,000, for all of that."); (CR-DE# 649: 99, 3/15/2017).

Agent Laboy testified that the movant said she married [Co-Defendant Osvaldo Lastre] Duran, a Cuban national, on April 11, 2014, with Mulet officiating over the ceremony and notarizing the documentation at Tita's Tramite and Travel. (CR-DE# 648: 19, 3/15/2017). A couple of days after she married Duran, the movant traveled back to Venezuela because of work and to see her sick grandmother. (CR-DE# 648:78, 3/15/2017). Agent Laboy testified that the movant left the United States shortly after her marriage to Duran on April 11, 2014 and returned on June 29, 2014. (CR-DE# 649:101, 3/15/2017). The marriage license was filed with the Bureau of Marriages, the Clerk of the Courts on April 14, 2014. Id. at 18-20; Government Ex. 10.

Agent Laboy testified that on July 1, 2014, the movant told her that she was at Tita's Tramite & Travel to take chocolate to Marrero because the movant travelled to Venezuela after Marrero and Rolando had notarized the marriage license. (CR-DE# 648: 75-76, 3/15/2017). The movant also told Agent Laboy that she was there to tell Marrero that she wanted to file for divorce. (CR-DE# 649: 57, 3/15/2017). When asked by Agent Laboy, the movant provided Duran's name but denied that she had his address or telephone number. (CR-DE# 648:77, 3/15/2017). Agent Laboy did not testify that the movant gave any indication that the movant believed she had done anything illegal. Id. at 75-78. Agent Laboy's July 1, 2014 interview of the movant was not recorded as that is not HSI's policy and procedure. (CR-DE# 649:60-62, 3/15/2017).

Agent Laboy testified about the statements the movant made during a second interview that Agent Laboy conducted on July 2, 2014 in the Doral office of HSI. (CR-DE# 648:79, 3/15/2017). While going over the movant's prior statements, Agent Laboy testified that she observed the movant becoming agitated, aggressive, denying her July 1, 2014 statements and accusing Agent Laboy of making up the movant's prior statements. Id. at 79-80. The movant repeatedly stated that she met Duran at a shopping center, they had great sex, fell in love and got married. Id. at 80-81. During the July 2, 2014 interview, Agent Laboy advised the movant that the movant may answer her cell phone that repeatedly rang during the interview. Id. at 81.

The movant did not answer her cell phone but allowed Agent Laboy to see the movant's cell phone. Id. Agent Laboy noticed on the screen of the cell phone that the caller was Duran and that the call log between the movant and Duran began on July 1, 2014. Id.

Agent Laboy testified that the movant, Duran and other individuals were arrested on August 19, 2015. (CR-DE# 648: 107, 3/15/2017). Agent Laboy testified that she read the movant her Miranda rights. Id. at 107-108. The movant waived her Miranda rights and spoke to Agent Laboy. Id. Agent Laboy provided the following testimony regarding the movant's post-Mirandized statement. Agent Laboy testified that in her Mirandized post-arrest statement, the movant told Agent Laboy that she had retained Marrero and Mulet to help her with her immigration status. Id. at 108. The movant told Agent Laboy that she married Duran to obtain her legal permanent resident card. Id. Agent Laboy testified that after their first meeting on July 1, 2014, the movant told Agent Laboy that Duran called the movant, they met up and came up with their story about how they met, had great sex, and were married. Id. at 111. Agent Laboy testified that the movant said that the movant and Duran came up with the story because they were afraid of getting in trouble. Id. The movant told Agent Laboy that on a different occasion the movant and Duran took naked photos of themselves at a motel to show them to Agent Laboy or other officials. Id. Agent Laboy testified that the movant told her that the movant and Duran took the pictures because they were desperate to be able to prove that their marriage was real, so they came up with the story of sex and met up at a motel and took pictures of themselves simulating that they were having sex. (CR-DE# 649:79-80, 96-97, 3/15/2017). Agent Laboy testified that the movant told her that the movant never lived with Duran, never had a romantic relationship with Duran, never had sex with Duran, and that the thought of having sex with Duran was gross due to Duran's physical appearance. Id. at 100.

At trial, the Court admitted Government Exhibits18A through G, which were some of the documents, pertaining to the movant, that were found on top of Mulet's desk during HSI's execution of the search warrant on Tita's Tramite & Travel on July 1, 2014. Id. at 92-93. Government Exhibits 18A through G include: a color copy of the movant's Venezuelan passport (Ex. 18-B), Duran's Immigration Form G-325 (Ex. 18-C), a color copy of Duran's Florida driver's license (Ex. 18-D), Duran's Cuban birth certificate (Ex. 18-E), a color copy of Duran's green card (Ex. 18-F), and a color copy of Duran's Cuban passport (Ex. 18-G). Id. at 92-93, 97, 99, 103.

## II.       Osvaldo Lastre Duran's Trial Testimony

At trial, Duran, a Cuban national, testified that before the marriage, the movant and Duran discussed with Marrero that the purpose of the marriage was to obtain lawful permanent residency for the movant and that Duran would be paid $5,000.  (CR-DE# 648: 106, 109; 649: 106, 109, 3/15/2017).  Duran testified that Marrero told the movant and Duran to take pictures together with different clothes at a Cuban restaurant, La Carreta, at Ermita de la Caridad, a church, and a Venezuelan place named El Arepazo, after marrying to appear as if they were in a romantic relationship, as these photos would possibly be included in the movant's application for adjustment of immigration status.  Id. at 110-11.  Additionally, Marrero explained that, on a later date, she would provide Duran and the movant a written document of questions to help them prepare for a marriage interview conducted by the United States Immigration and Citizenship Services.  (CR-DE# 649:112, 3/15/2017).  Duran testified that he did not know his conduct was illegal.  (CR-DE# 651:73, 3/15/2017).  Duran testified that the movant did not express any concerns or worries about getting married. Id. at 105.  Duran testified that he married the movant for the sole purpose of helping her obtain an immigration benefit and evade immigration laws.  Id. at 107.  Duran testified that they took pictures "to show that [they] were having sex.  But we did not have any sex. We did not have any intimate relationship.  It was just to make believe that we did." (CR-DE# 650:21, 3/15/2017).  Duran admitted at trial that he deceived the movant and did not disclose having a common-law wife and children until after they were married. (CR-DE# 651:15-16, 3/15/2017).

Duran testified that within a couple of days of marriage, the movant told Duran that she had to travel to Venezuela for work and to see her sick grandmother.  (CR-DE# 650:8-10, 3/15/2017).  Duran drove the movant to the airport and told her that he thought her travel to Venezuela shortly after their marriage would not look good at an immigration interview.  Id. at 8.  Duran testified that the movant told Duran that her grandmother's illness is an emergency and that she would remain in contact with him while she was gone. Id. 8-9.  The movant remained in Venezuela for more than two months thereafter.  (CR-DE# 650:11, 3/15/2017).  Duran testified that he did not communicate via emails, texts, mailings, FaceTime, WhatsApp, or Skype connections with the movant while she was in Venezuela. (CR-DE# 651:40-44, 3/15/2017).  Duran testified that the movant did not send him anything to indicate they were in a relationship while she was in Venezuela.  Id. at 44.

Duran testified that the movant called him on July 1, 2014 after she met with Agent Laboy and told him that she wanted to speak with him

because she was questioned by the police. (CR-DE# 650:13, 14-15; 651: 44, 3/15/2017). Duran testified that the movant and Duran met that day and the movant told him that she told the police about their false marriage. (CR-DE# 650:15-16, 3/15/2017). Duran testified that in response he asked the movant, "How are you going to tell the truth to the police? You know that if you say that, we're already in jail." Id. at 16. Duran testified that the movant advised him that she had an appointment the next day at the police office and invited Duran to go with her, but he refused. Id. at 16-17. Duran testified that they had agreed to say that they met at a mall, their marriage was real, because of love, and she needed to travel to Venezuela to see her sick grandmother. Id. at 17.

Duran testified that after the July 2, 2014 interview with Agent Laboy, the movant met with Duran and told him that she denied what she told Agent Laboy on July 1, 2014 because she felt nervous, pressured and coerced, but that the marriage was for real and they married for love. Id. at 19. Duran testified that the marriage was not real and was not based on love. Id. Duran testified that the couple decided to go to a motel and take nude photos to look like they were having sex, but they did not have sex and did not have an intimate relationship. Id. 20-22. Duran testified that the movant and he decided that they were going to convince whoever they needed to that the marriage was for real and that it was based on love. Id. at 19-20. Duran commenced divorce proceedings on July 29, 2014 and was divorced from the movant in December 2014. Id. at 25-26; Government Ex. 19.

Duran testified that he spoke with Agent Laboy two or three times before he was arrested. (CR-DE# 650:27-28, 3/15/2017). Duran testified that he had relationship problems with his long-time partner and the mother of his children. (CR-DE# 650:29-30). Duran testified that he told Agent Laboy that he married the movant for sex. Id. at 30. Duran testified that he married the movant for money, not love, to help the movant obtain her legal status in the United States and for Duran to receive money. Id.

Duran testified that on August 19, 2015, the movant and Duran were arrested separately but placed in the backseat of a police car together. (CR-DE# 650:34-35). Duran testified that he thought he and the movant were placed inside the police car in order to record their conversation or videotape them. Id. at 35. Their conversation was recorded. Id. at 36, 39, 43; Transcript of the recording (Government Ex. 4); CD of the recording (Government Ex. 8). Duran testified that while they were in the police car together, the movant kept telling Duran to tell the truth and that it was in his best interest to tell the truth. Id. at 35-36, 47-50. Duran testified that he thought their conversation was being recorded and that the movant was trying

6

to incriminate him.  Id. at 48.  While Duran and the movant were in the backseat of the police car, Duran testified that he stated, "We got married because we liked each other and to have – have sex."  Id. at 49.  At trial, Duran testified that he understood he was doing something wrong but did not think it was a crime at the time he married the movant to help her evade immigration laws.  Id. at 51.

The government did not produce any initialed notes of a confession by the movant, any photographs taken by or of the movant, or any records indicating that the movant made any calls to the government's witnesses. (CR-DE# 653:58-59, 95-97, 100-104, 3/15/2017).

### III.    Manuel Andres Gomez's Trial Testimony

At trial, Manuel Andres Gomez, a government witness who was a disgruntled former client of Tita's Tramite & Travel, testified about his dealings with Marrero and Mulet in 2012 to resolve his immigration status issues by marrying to obtain a green card.  (CR-DE# 647:53-78).  Gomez testified that Marrero required cash payments to pay for a Cuban national bride, that Mulet married the couple in their office the same day as they obtained the marriage license, that Marrero advised them to take photographs to document their relationship and suggested that they go to Ermita de la Caridad, and provided the couple with sample immigrations questions.  Id. Gomez never met the movant and had no knowledge of her interactions with Marrero, Mulan or Duran.  (CR-DE# 647:83; CR-DE# 648: 6, 20-21).

(Report at 4-11.)  The Government rested on August 30, 2016, and Movant did not present a case-in-chief.  (Trial Tr., Aug. 30, 2016, D.E. 652 at 30:14, 33:7-8.)  Defense counsel moved for judgment of acquittal under Federal Rule of Civil Procedure 29, and the Court denied the motion.  (Id. at 37:2 – 75:23.)

During the subsequent charge conference, defense counsel requested that the jury instructions include a modified version of the Eleventh Circuit's pattern Good-Faith Defense jury instruction.  (Id. at 92:15.)  At the time of Movant's trial, the Eleventh Circuit's pattern Good-Faith Defense instruction stated, in its entirety:

     "Good faith" is a complete defense to a charge that requires intent to defraud. A defendant isn't required to prove good faith. The Government must prove intent to defraud beyond a reasonable doubt.

     An honestly held opinion or an honestly formed belief cannot be fraudulent intent – even if the opinion or belief is mistaken. Similarly, evidence of a mistake in judgment, an error in management, or carelessness can't establish fraudulent intent.

     But an honest belief that a business venture would ultimately succeed doesn't constitute good faith if the Defendant intended to deceive others by making representations the Defendant knew to be false or fraudulent.

Special Instruction 17, Good-Faith Defense, Eleventh Circuit Pattern Jury Instructions (Criminal Cases) 2010, at 84.  Defense counsel requested that the Court issue Special Instruction 17 without the third paragraph.  (Trial Tr., Aug. 30, 2016, Cr-D.E. 652 at 94:20 – 95:2.)  The Government stated that it "would not oppose a good-faith defense instruction as set forth in Special Instruction 17.  However, we would ask that the third paragraph also be included so as to give the full instruction."  (Id. at 95:12-15.)  Defense counsel stated that if the Court was inclined to give Special Instruction 17 with the third paragraph, then the defense was withdrawing the request for the good-faith defense instruction.  (Id. at 99:16-18.)  The Court stated that it was "inclined to give it, but the three paragraphs in the special."  (Id. at 99:22-23.)  Defense counsel stated that "the language is problematic, your Honor, in terms of the third paragraph[,]" and withdrew the request.  (Id. at 99:24 – 100:2.)  The Court then stated "for the record that, based upon the initial statement that Osvaldo Lastre Duran said to Agent Laboy that they married for sex, that I would have given the special instruction as Special 17 in the pattern in total."  (Id. at 100:3-7.)  However, because

Movant withdrew her request for a good-faith defense instruction, the Court did not give a good-faith defense instruction.  (See id. at 100:8-9; see also Jury Instructions, D.E. 544.)

On August 31, 2016, the jury returned a verdict of guilty as to both charges.  (Cr-D.E. 536; Cr-D.E. 653 at 147:25 – 148:7; see also Jury Verdict, D.E. 539.)

On November 16, 2016, the Court sentenced Movant to time served as to both counts, to be followed by three years' supervised release, including eight months' home detention as a special condition of supervised release.  (Tr. of Sentencing Hr'g, D.E. 654 at 43:12-25; see also Judgment, D.E. 623.)

Defendant appealed arguing, inter alia, that the Court "abused its discretion by refusing to instruct the jury regarding her good-faith defense[.]"  United States v. Alvarez, 732 F. App'x 729, 736 (11th Cir. 2018).  The Eleventh Circuit found that Movant was "precluded from raising this argument because she invited any error in the district court's decision to not instruct the jury regarding her good-faith defense."  Id. (citing United States v. Gibson, 708 F.3d 1256, 1275 (11th Cir. 2013); United States v. Ross, 131 F.3d 970 ,987 (11th Cir. 1997)).

> After the district court indicated that it would give the entire pattern instruction instead of the modified instruction that Alvarez had requested, she withdrew her request. The district court stated that it would have given the pattern instruction, based on trial testimony, but was not doing so because Alvarez withdrew her request. Additionally, when given the opportunity to object after the jury was instructed, Alvarez did not raise any objections.

Id.

Movant also argued on appeal that the Court "erred in denying her motion for a judgment of acquittal based on its determination that the government had provided

sufficient evidence to support convictions for conspiracy to commit marriage fraud and marriage fraud." Alvarez, 732 F. App'x at 734.  She argued that although the Eleventh Circuit had not "held that the government must prove that a defendant knew that her conduct was unlawful when proving marriage fraud," it should follow other courts of appeals that had done so. Id. (citations omitted).  Movant argued that the Government had failed to prove that she knew her conduct was unlawful and therefore her convictions were invalid. Id.

The Eleventh Circuit found no error in denying Movant's Rule 29 motion because "even assuming we required proof that Alvarez knew that her conduct was illegal, the government presented sufficient evidence to sustain the conviction." Id. (citing United States v. Rojas, 718 F.3d 1317, 1320 & n.2 (11th Cir. 2013)).  Specifically,

> The government presented evidence that Alvarez married Duran, a Cuban citizen, and, prior to their marriage, they discussed that the purpose of the marriage was to obtain legal status for Alvarez to remain permanently in the United States.  The government also presented evidence that Alvarez and Duran did not plan to have a life together as a married couple.  Prior to their marriage, Alvarez and Duran discussed that they would need to take pictures and practice questions to make their marriage look real during the immigration interview, indicating that Alvarez knowingly entered the marriage in order to evade U.S. immigration laws.  Notably, if Alvarez believed that marrying just to obtain lawful permanent resident status was in accordance with U.S. immigration law, she would have had no reason to take fake pictures and other steps to convince immigration authorities that their marriage was real.

Id.  The Eleventh Circuit further found that there was sufficient evidence supporting the conspiracy charge:

> [T]he government presented sufficient evidence for a reasonable jury to find that at least two individuals agreed to participate in the marriage-fraud scheme, Alvarez was a knowing and voluntary participant, and there was an

overt act by a conspirator.  See Gonzalez, 834 F.3d at 1219; Rojas, 718 F.3d at 1320; Seher, 562 F.3d at 1364.  First, the government presented testimony that, in addition to Alvarez and Duran agreeing to marry as part of the scheme, at least two other people agreed to be involved, and Alvarez's marriage was part of a larger marriage fraud conspiracy including at least two other people.  Alvarez had paid Marrero and Mulet to find her a Cuban husband, Mulet had married Alvarez and Duran, and Marrero had instructed them on how to make their marriage look real.  Furthermore, Manuel Gomez testified regarding his fraudulent marriage to a Cuban woman that he had entered into under Marrero and Mulet's direction in order to resolve his immigration issues.

Second, as discussed above, the government presented sufficient evidence that Alvarez was a knowing and voluntary participant in the fraudulent marriage, which was part of the conspiracy.  Third, the government presented evidence that an overt act was committed in furtherance of the scheme because Alvarez went through a staged marriage ceremony on April 11, 2014.  Accordingly, the evidence was sufficient for a reasonable factfinder to find Alvarez guilty beyond a reasonable doubt as to both offenses.  Seher, 562 F.3d at 1364.

Id.

Ultimately, the Eleventh Circuit rejected all of Movant's arguments and affirmed her convictions and sentence.  Id. at 732-37.  Movant did not petition the Supreme Court for a writ of certiorari.

On July 22, 2019, Movant filed her Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence, (Cr-D.E. 690), which was opened as a new civil case, 19-23048-Civ-Lenard/O'Sullivan, (D.E. 1).[3]  The Motion asserts that Movant was denied the

_____

[3]    The Government does not challenge the Motion on grounds that (1) it is untimely or (2) Movant was not "in custody" when she filed the Motion.

As relevant here, a one-year limitations period applies to motions under 28 U.S.C. § 2255 running from the date on which the judgment of conviction became final.  28 U.S.C. § 2255(f)(1).  Here, Movant's conviction became final ninety days after the Eleventh Circuit issued its opinion affirming the Court's Judgment when the period for filing a petition for writ of certiorari expired.  Clay v. United States, 537 U.S. 522, 525 (2003).  The Eleventh Circuit issued its opinion on April

effective assistance of counsel when her attorney forfeited her right to proceed with a good faith instruction and defense.  (Id. at 4.)

The Court referred the case to Judge O'Sullivan for a ruling on all pretrial, nondispositive matters and for a Report and Recommendation on any dispositive matters. (D.E. 3.)  The Government filed a Response to the Motion on September 16, 2019, (D.E. 10), to which Movant filed a Reply on October 7, 2019, (D.E. 13).  On May 27, 2020, Judge O'Sullivan held an evidentiary hearing.  (D.E. 25.)  Movant's former trial counsel, Menachem Mayberg, Esq., was the only witness who testified at the evidentiary hearing. (Report, D.E. 29 at 3.)  Mr. Mayberg testified that he could not recall the basis or justification for his belief that the pattern Good-Faith Defense jury instruction that he did not request at trial was "problematic."  (Id.)

After the hearing, Judge O'Sullivan ordered the Parties to file supplemental briefs. (D.E. 26.)  Movant filed her post-hearing brief on June 15, 2020, (D.E. 27), to which the Government filed a Response on June 29, 2020, (D.E. 28).

---

23, 2018, and the period for filing a petition for writ of certiorari expired ninety days later on July 22, 2018.  See id.  However, because July 22, 2018 was a Sunday, the ninety-day period for filing a petition for writ of certiorari expired on Monday, July 23, 2018.  See Fed. R. Civ. P. 6(a)(1). Pursuant to 28 U.S.C. § 2255(f)(1), Movant had one year from that date to file her 2255 Motion. Movant filed her 2255 Motion within the one-year limitations period on July 22, 2019.  (D.E. 1.) Therefore, the Court finds that the Motion was timely filed within one year of the date Movant's conviction became final.

The relief provided under Section 2255 is only available to "[a] prisoner in custody under sentence of a court established by Act of Congress . . . ."  28 U.S.C. § 2255(a) (emphasis added). A person serving a term of supervised release is "in custody" within the meaning of 2255.  United States v. Brown, 117 F.3d 471, 475 (11th Cir. 1997).  According to the United States Probation Office, Movant's term of supervised release expired on November 18, 2019—three years after the Court entered Judgment.  Movant filed the instant 2255 Motion while she was still on supervised release on July 22, 2019.  Therefore, the Court finds that Movant was "in custody" for purposes of Section 2255 when she filed her Motion.

On August 19, 2020, Judge O'Sullivan issued his Report and Recommendations. (D.E. 29.)  Judge O'Sullivan recommends denying the 2255 Motion because Movant failed to show that she was prejudiced by counsel's allegedly deficient performance.  (Id. at 18.) Judge O'Sullivan noted that marriage fraud is not a continuing offense and is complete when the marriage occurs.  (Id. at 18-19 (discussing Rojas, 718 F.3d at 1320 & n.2).)  Judge O'Sullivan found that the "trial evidence of the movant's decision to enter the marriage for the purpose of evading any provision of the immigration laws is overwhelming."  (Id. at 20.)  Specifically:

> Agent Laboy testified that the movant told Agent Laboy that the movant paid a sum of cash (either $6,000 or $2,500) to Tita's Tramite & Travel to marry Duran, a Cuban national.  The movant and Duran obtained a marriage license, were married on April 11, 2014, and provided the marriage license to the Clerk of Courts, Marriage Bureau.  In her first interview with Agent Laboy, the movant admitted her plan to marry Duran to obtain immigration benefits.  After that initial July 1, 2014 interview, the movant called Duran, met with him and decided to make up their story that they met at a shopping mall and married for sex.  At her July 2, 2014 interview with Agent Laboy, the movant denied what she told Agent Laboy on the previous day and told Agent Laboy that she met Duran at a shopping mall and married him for sex. After the movant's meeting with Agent Laboy on July 2, 2014, the movant and Duran checked into a motel and took nude photographs to provide proof of their relationship.
>
> At trial, the evidence in the record included inconsistent statements made by the movant and Duran.  On at least one occasion, each of them said they married for sex.  On separate occasions both denied ever having sex with each other and the movant told Agent Laboy that the idea of sex with Duran was gross.  On another occasion, each of them said they married for the movant to receive an immigration status benefit.  Duran testified that Marrero, the movant and he discussed that the purpose of the marriage was to obtain lawful permanent residency for the movant and that Duran would be paid $5,000.  Duran testified that Marrero suggested that they take photographs in different locations.  The fact that the movant and Duran divorced within the same year does not alter the reason the movant and Duran agreed to marry in the first place.

13

There is no evidence of the movant engaging Tita's Tramite & Travel for legitimate match-making services. The movant was never in a romantic relationship with Duran and never intended to live with him. Documents seized during the execution of the search warrant included documents that would be necessary for the movant to seek a change to her immigration status.

. . . Although the movant and Duran provided inconsistent statements, the record shows that the movant had no plans to create a permanent life with Duran as a married couple and that the couple did not have a romantic relationship. Their attempt to cover up their fraudulent marriage after the fact by creating the shopping mall story and taking nude photographs in a motel supports the movant's marriage fraud conviction as well as the conspiracy to commit marriage fraud conviction. See Alvarez, 732 Fed. App'x at 735 (describing the facts that support both convictions). In Alvarez, the Eleventh Circuit noted that "if Alvarez believed that marrying just to obtain lawful permanent resident status was in accordance with U.S. immigration law, she would have had no reason to take fake pictures and other steps to convince immigration authorities that their marriage was real." Id.

(Id. at 19-21.) Based on this evidence, Judge O'Sullivan found that Movant "has failed to show that even if the trial Court gave the pattern good faith jury instruction that there is a reasonable probability that the outcome would have been different." (Id. at 21-22.)

On September 2, 2020, Movant filed her Objections. (D.E. 30.)

## II.     Legal Standards

### a.      Report and recommendations

Upon receipt of the Magistrate Judge's Report and Movant's Objections, the Court must "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); accord Fed. R. Civ. P. 72(b)(3). The court must conduct a de novo review of any part of the Report that has been "properly objected to." Fed. R. Civ. P. 72(b)(3); see 28 U.S.C. § 636(b)(1)

(providing that the district court "shall make a <u>de novo</u> determination of those portions of the [R & R] to which objection is made").  "Parties filing objections to a magistrate's report and recommendation must specifically identify those findings objected to.  Frivolous, conclusive, or general objections need not be considered by the district court." <u>Marsden v. Moore</u>, 847 F.2d 1536, 1548 (11th Cir. 1988).  Those portions of a magistrate judge's report and recommendation to which no objection has been made are reviewed for clear error.  <u>See Lombardo v. United States</u>, 222 F. Supp. 2d 1367, 1369 (S.D. Fla. 2002); <u>see also</u> <u>Macort v. Prem, Inc.</u>, 208 F. App'x 781, 784 (11th Cir. 2006) ("Most circuits agree that [i]n the absence of a timely filed objection, a district court need not conduct a <u>de novo</u> review, but instead must only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.") (internal quotation marks and citations omitted).  The Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

      **b.**      **28 U.S.C. § 2255**

Because collateral review is not a substitute for direct appeal, the grounds for collateral attack on a final judgment, pursuant to 28 U.S.C. § 2255, are extremely limited. Pursuant to Section 2255, a prisoner in federal custody may move the court which imposed the sentence to vacate, set aside, or correct the sentence if it was imposed in violation of federal constitutional or statutory law, was imposed without proper jurisdiction, is in excess of the maximum authorized by law, or is otherwise subject to collateral attack.  <u>See United States v. Jordan</u>, 915 F.2d 622, 625 (11th Cir. 1990).  Thus, relief under Section 2255 "is reserved for transgressions of constitutional rights and for that narrow compass of other

injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice." Lynn v. United States, 365 F.3d 1225, 1232 (11th Cir. 2004) (quotation marks and citations omitted).  If a court finds a claim under Section 2255 valid, the court "shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255(b).

### c.    Ineffective assistance of counsel

With regard to Movant's claim of ineffective assistance of counsel, the two-pronged test established in Strickland v. Washington, 466 U.S. 668 (1984) applies.  "First, the defendant must show that counsel's performance fell below a threshold level of competence.  Second, the defendant must show that counsel's errors due to deficient performance prejudiced his defense such that the reliability of the result is undermined." Tafero v. Wainwright, 796 F.2d 1314, 1319 (11th Cir. 1986).  Under the first prong of the Strickland test, Petitioner "must establish that no competent counsel would have taken the action that his counsel did take." Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc).  Under the second prong, Petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.  The Eleventh Circuit has routinely found that where there is overwhelming evidence of guilt, a 2255 movant cannot show Strickland prejudice. See, e.g., Boschen v. United States, 845 F.2d

921, 922-23 (11th Cir. 1988); <u>Streeter v. United States</u>, 335 F. App'x 859, 862-63 (11th Cir. 2009); <u>Franklin v. United States</u>, 227 F. App'x 856, 857 (11th Cir. 2007).

If the Court finds that the movant failed to satisfy one prong of the test, it need not address the other.  <u>Id.</u> at 697; <u>see also</u> <u>Brown v. United States</u>, 720 F.3d 1316, 1326 (11th Cir. 2013) ("If a defendant fails to satisfy either <u>Strickland</u> prong, we need not address both.") (citations omitted).

## III.   Applicable Law

### a.   Marriage fraud

"Federal law prohibits '[a]ny individual . . . [from] knowingly enter[ing] into a marriage for the purpose of evading any provision of the immigration laws.'" <u>Avlarez</u>, 732 F. App'x at 734 (quoting 8 U.S.C. § 1325(c)).  "To prove marriage fraud under § 1325(c), the government must establish that: '(1) the defendant knowingly entered into a marriage (2) for the purpose of evading any provision of the immigration laws.'" <u>Id.</u> (quoting <u>Rojas</u>, 718 F.3d at 1320).  "Although some circuits have required that the government also prove the defendant knew that her conduct was illegal when she entered the marriage, [the Eleventh Circuit] ha[s] not determined whether such a showing is necessary." <u>Id.</u> at 735 (citing <u>Rojas</u>, 718 F.3d at 1320 n.2).

### b.   Conspiracy

"Federal law prohibits conspiring to commit an offense against the United States or to defraud the United States." <u>Id.</u> (citing 18 U.S.C. § 371).  "To prove conspiracy under § 371, the government must establish: '(1) an agreement by two or more individuals to commit an offense against or defraud the United States; (2) knowing and voluntary

participation; and (3) an overt act by a conspirator.'"   Id. (quoting United States v. Gonzalez, 834 F.3d 1206, 1219 (11th Cir. 2016)).

## IV.   Discussion

Movant objects to Judge O'Sullivan's finding that there was "overwhelming" evidence that Movant's decision to enter the marriage was for the purpose of evading a provision of the immigration laws.  (Obj. at 1, 5.)  She argues that "the Report relies mistakenly on conduct and statements made by the defendant to exculpate herself after she learned that federal agents considered her conduct criminal."  (Id. at 2 (citing Report at 19-20).)  She agrees with Judge O'Sullivan that "any marriage fraud would have been complete as of April 2014 upon the marriage's occurrence[,]" (id. at 2 (citing Report at 18)), but argues that there is no evidence that she knew at the time she was married in April 2014 that her conduct was illegal, (id. at 2-3).  Movant further argues that Judge O'Sullivan erroneously viewed the evidence in the light most favorable to the Government.  (Id. at 4.)  She argues that although the Report cites evidence relevant to the good-faith defense, the Report "fails to discuss the importance of" that evidence.  (Id.)  In this regard, she states:

- Alvarez met Odalys Marrero and Rolando Mulet in a normal social event that did not suggest illegality or impropriety. Cr-DE:648:76.  Marrero and Mulet owned Tita's Tramite and Travel, Inc. (Tita's), with an office on a busy street in Miami.  Cr-DE:647:52-53; Cr- DE:648:21, 64.  The office was open to the public and looked legitimate.  Cr-DE:648:21; Cr- DE:651:11-12.  They had been in business for many years.  Cr-DE:648:21; Cr-DE:649:44.  They "served as a matchmakers for foreign nationals who would pay them to find spouses who were natives and citizens of Cuba."  DE:10:2 (emphasis added).

- Duran deceived Alvarez, by concealing his common-law wife and children.  See Cr-DE:651:15.  When he married Alvarez, Duran (who later pled guilty) did not know his conduct was illegal, Cr-DE:650:51—thus, he would likely not have conveyed criminal suspicion to Alvarez.  Duran testified at trial: "I

simply got married. But when I realized it was a crime, then I didn't [go forward with anything]." Cr-DE:651:73. Those are odd admissions for a government witness who is supposed to be the defendant's wilful [sic] conspirator. Alvarez did not "express [to Duran] any concerns . . . or worries about . . . getting married in this way." Cr-DE:651:105. Duran and Alvarez did not fulfill the required process to go forward with immigration use of the marriage. Cr-DE:649:112. Evidence at trial that Duran's guilty plea was accepted even though he didn't realize he was committing a crime <u>heightened</u> the need for the good faith defense theory instruction; without it, the jury might have concluded good faith was not a defense given that Duran did not know of any illegality at the time of the marriage. Alvarez was not present for the purported meeting at which Marrero offered Duran a financial incentive to enter into a marriage. Cr-DE:649:106. Still, Marrero told Duran "everything would be legal," Cr-DE:649:106, and suggested he would be pleased with Alvarez. Cr-DE:649:108.

- When Alvarez told Duran that she had told the police about their marriage, Duran <u>berated</u> Alvarez, saying that because of her statement, "we're already in jail." Cr-DE:650:16. The impact of the Laboy interview and the Duran interaction—both of which occurred three months after the marriage—caused Alvarez to believe she violated the law. Alvarez told Duran she had an appointment to speak with the police the next day, and she asked Duran to go with her. Cr-DE:650:16. He refused. Cr-DE:650:16-17. Instead, he told Alvarez to go to the meeting and tell the police an exculpatory story. Cr-DE:650:17. Alvarez allegedly followed through on Duran's demands in her meeting with Laboy on July 2, but again Laboy did not record the interaction. Cr-DE:649:60-62, 70-71.

- During the July 1 search of Tita's office, agents found documents that pertained to Duran and Alvarez, including a copy of Alvarez's passport, but <u>absolutely no documents signed or prepared by Alvarez for any immigration purpose</u>, such as the i325 application that would have been necessary to use the marriage for immigration purposes. Cr-DE:648:90, 92-93, 98-104; Cr-DE:649:16-19. Tita's never submitted any immigration paperwork on Alvarez's behalf, and <u>no immigration application was ever signed by Alvarez</u>. Cr-DE:649:74-75.

- In August 2015, after Alvarez's post-arrest statement concluded, the agents placed Alvarez and Duran in a car together and recorded the conversation that ensued. Cr-DE:649:21; Cr-DE:650:35. Alvarez repeatedly implored Duran to tell the truth. Cr-DE:650:35-36, 47-50. And after all this, Duran testified at trial that when he decided to marry Alvarez, he "never thought that it was a crime." Cr-DE:650:51.

(Id. at 7-9.)  Movant further argues that Judge O'Sullivan failed "to give appropriate weight to defects and inconsistencies in the government's proof."  (Id. at 3.)  In this regard, she states:

- Although Laboy claimed to have writings showing Alvarez's agreement with Laboy's version of a post-arrest interview—in which Alvarez said nothing about knowing in April 2014 that her conduct was illegal—no such notes were produced at trial.

- Duran claimed that he and Alvarez took photos as proof that they were a couple. Cr-DE:649:110-12.  But no such photographs were produced at trial. Duran testified that he took nude photos of simulated sex with Alvarez. Cr-DE:650:20-21.  But no such photographs were ever produced at trial or in discovery.  And when defense counsel pointed this out at trial, he was met with a burden-shifting rebuttal argument by the government.  Alvarez moved for a mistrial on grounds that the government had attempted in rebuttal to shift the burden of proof.[4]  Cr-DE:653:139-40; see also Cr-DE:653:113, 140, 144-47.

- Despite testimony that the program for a Tita's fraudulent marriage included elaborate conduct to make it appear the couple cohabited and otherwise shared a life, none of that was shown as to Alvarez and Duran.  No joint bank accounts, no services under both names; nothing reflecting a wedding ceremony or celebration; none of the usual indicia of a faked marriage.  The absence of records or photographs of ceremonies, emails, joint bank accounts, utilities, or even a single text between Duran and Alvarez was telling as to the absence of an effort to present a false image of marriage—at any time prior to Duran's desperate July 2014 demands that Alvarez help him avoid problems with Agent Laboy.

- Government witnesses testified that Alvarez corrected and initialed notes of a statement, made phone calls to a government witness, and took photographs.  E.g., Cr-DE:648:106-07, 109-11; Cr-DE:649:14-15; Cr-DE:650:6-7, 9-11, 20-21.  But no such exhibits or records were offered by the government at trial or at the § 2255 evidentiary hearing: no confession,

---

[4]    Movant argued on appeal that the Court abused its discretion by denying her mistrial on these grounds, but the Eleventh Circuit rejected the argument.  Alvarez, 732 F. App'x at 736.

no photographs, no any records indicating Alvarez made any such phone calls.

- Also, the manner in which some exculpatory evidence had to be coaxed from the government's witnesses warranted doubts about the government's theory of Alvarez's intent.  See, e.g., Cr-DE:649:57 (Agent Laboy first denies that Alvarez told her she was at Tita's to get divorced without ever using the immigration application, then under cross-examination, admits it; "Q. Do you recall saying that she mentioned that she was there to give Tita a gift and also wanted to file for divorce?  She didn't want to go through with the marriage with the Cuban man?  A. Yes.  Q. So she did tell you that that day? A. Correct.").

(Id. at 9-10.)  Movant argues that the fact that she never actually attempted to obtain an immigration benefit makes this different from other marriage fraud cases.  (Id. at 6.)  She further argues that Judge O'Sullivan applied an incorrect standard for Strickland prejudice, requiring her to show a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different.  (Id.)  She argues that the proper test is whether there was an error that "undermine[s] confidence in the outcome."  (Id. (quoting Strickland, 466 U.S. at 694).)

Upon de novo review, the Court finds that Movant has failed to show that she is entitled to relief under Section 2255.  Even assuming arguendo that defense counsel provided deficient performance by forfeiting Movant's right to proceed with a Good-Faith Defense jury instruction, she has failed to establish a reasonable probability that but for this deficiency the outcome of the proceedings would have been different.[5]

---

[5]     As an initial matter, the Court summarily rejects Movant's argument that Judge O'Sullivan applied an incorrect standard for prejudice.  "To establish prejudice a petitioner must 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  Castillo v. Fla., Sec'y of DOC, 722 F.3d 1281, 1286 (11th Cir. 2013) (quoting Strickland, 466 U.S. at 687).  This is the standard Judge O'Sullivan

At the time of Movant's trial, the Eleventh Circuit's pattern Good-Faith Defense instruction stated:

> "Good faith" is a complete defense to a charge that requires intent to defraud. A defendant isn't required to prove good faith. The Government must prove intent to defraud beyond a reasonable doubt.
>
> An honestly held opinion or an honestly formed belief cannot be fraudulent intent – even if the opinion or belief is mistaken. Similarly, evidence of a mistake in judgment, an error in management, or carelessness can't establish fraudulent intent.
>
> But an honest belief that a business venture would ultimately succeed doesn't constitute good faith if the Defendant intended to deceive others by making representations the Defendant knew to be false or fraudulent.

Special Instruction 17, Good-Faith Defense, Eleventh Circuit Pattern Jury Instructions (Criminal Cases) 2010, at 84.

Defendant did not present a case-in-chief, and Movant cites no direct evidence that she had an honestly held opinion or honestly formed belief that marrying Duran to obtain an immigration benefit was legal (or otherwise non-fraudulent).  Movant argues that when construing all of the evidence in her favor and drawing all inferences in her favor, "there is reason to believe that at least one juror would have found reasonable doubt as to whether the defendant's marital decision was based on a good faith belief that the matchmaking

---

applied.  (Report at 21-22 ("The plaintiff has failed to show that even if the trial Court gave the pattern good faith jury instruction that there is a reasonable probability that the outcome would have been different.").)   Although "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome[,]" Strickland, 466 U.S. at 694, there is no indication that Judge O'Sullivan applied any other test for assessing whether a "reasonable probability" existed in this case.

service had arranged a lawful marriage for her." (Obj. at 1.) The Court disagrees. As Judge O'Sullivan correctly noted:

> There is no evidence of the movant engaging Tita's Tramite & Travel for legitimate match-making services. The movant was never in a romantic relationship with Duran and never intended to live with him. Documents seized during the execution of the search warrant included documents that would be necessary for the movant to seek a change to her immigration status.

(Report at 20.) Indeed, in her initial discussion with Agent Laboy on July 1, 2014, Movant admitted that she retained Mulet and Marrero to help her with her immigration status; after Mulet and Marrero told Movant that "the only way that they can help her is finding a Cuban spouse," Movant paid them $6,000 in cash to "start the process." (Cr-D.E. 648 at 76:12 – 77:1.) Movant further admitted during her post-arrest, <u>Mirandized</u> statement to Agent Laboy that she married Duran "to obtain her legal permanent resident card, her green card, here." (<u>Id.</u> at 108:8 – 109:1.)

Furthermore, Duran testified that before their marriage, he was introduced to Movant at Tita's Tramite & Travel during a meeting with Mulet and Marrero. (Cr-D.E. 649 at 108:11:14.) At that meeting—in Movant's presence—Marrero explained that Movant and Duran were going to be married because Movant "needed the legal status in order to be able to remain in this country[,]" and further explained that Duran would be paid $5,000 after Movant adjusted her immigration status.[6] (<u>Id.</u> at 109:12-17.) During the

---

[6] In her Objections, Movant argues that she "was not present for the purported meeting at which Marrero offered Duran a financial incentive to enter into a marriage.'" (Obj. at 8 (citing Cr-D.E. 649at 106).) Although Movant may not have been present at that initial meeting, she was present during a subsequent meeting during which Marrero explained that Duran would be paid $5,000 after Movant adjusted her immigration status. (Cr-D.E. 109:12-17.)

same meeting, Movant stated that she was marrying Duran because "she wanted to remain permanently in this country, that her objective would be to -- her objective was to get documents and papers to be able to remain in this country permanently." (Id. at 109:21-23.)   During this meeting Marrero told Movant and Duran to take pictures together at different locations—a Cuban restaurant, "a religious place," and a "Venezuelan place[,]"—"with different attire, different clothing, to simulate that it was on different dates." (Id. at 110:23 – 111:22.)   She also told them that she would provide them "with a written document that would include questions that we would have to answer in order to prepare for Immigration and the interview in Immigration." (Id. at 112:6-8.)   As the Eleventh Circuit observed, "if Alvarez believed that marrying just to obtain lawful permanent resident status was in accordance with U.S. immigration law, she would have had no reason to take fake pictures and other steps to convince immigration authorities that their marriage was real." Alvarez, 732 F. App'x at 735.   Thus, although Movant argues that the Report "relies mistakenly on conduct and statements made by the defendant to exculpate herself after she learned that federal agents considered her conduct criminal[,]" (Obj. at 2), there was plenty of evidence from which the jury could conclude that Movant entered the marriage knowing that her conduct was illegal.   The overwhelming evidence of Movant's later conduct and statements reinforce this conclusion.

Therefore, in light of all of the evidence and having considered all of Movant's arguments, the Court finds that there is not a reasonable probability—i.e., a probability sufficient to undermine confidence in the outcome—that the jury would have acquitted

Movant if defense counsel had asked the Court to issue the Eleventh Circuit's pattern Good-Faith Defense instruction in its totality.

## V.   Conclusion

Accordingly, it is **ORDERED AND ADJUDGED** that:

1.   The Report and Recommendation of the Magistrate Judge issued August 19, 2020 (D.E. 29) is **ADOPTED**;

2.   Movant Elizabet Alvarez's Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence (D.E. 1) is **DENIED**;

3.   A Certificate of Appealability **SHALL NOT ISSUE**;

4.   All pending motions are **DENIED AS MOOT**; and

5.   This case is now **CLOSED**.

**DONE AND ORDERED** in Chambers at Miami, Florida this 1st day of February, 2021.

**JOAN A. LENARD**
**UNITED STATES DISTRICT JUDGE**